## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
## RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Dustin McPhillips, Special Agent of the United States Department of Agriculture, Office of Inspector General, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is made in support of an application under Rule 41 of the Federal Rule of Criminal Procedure for a search warrant authorizing the search and seizure of items enumerated in Attachment B, which are to be found at the addresses/locations listed in Attachment A.

2.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that illegal dog fighting, possession, training, transport, purchase, sale, receipt, and delivery of dogs intended to be used for participation in an animal fighting venture, and conspiracy to commit such offenses, in violation of 7 U.S.C. § 2156 and 18 U.S.C. § 371, and that evidence, instrumentalities, and fruits of such violations, as described in Attachment B, will likely be found at the addresses/locations listed in Attachment A.

3.      I am a Special Agent with the United States Department of Agriculture Office of Inspector General ("USDA-OIG"). As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

4.      I have been employed with USDA-OIG since March of 2020. I attended the Criminal Investigators Training Program at the Federal Law Enforcement Training Center from August 2020 until November 2020. Prior to that, I graduated from the South Carolina Criminal Justice Academy and worked as a Deputy Sheriff for the Richland County Sheriff Department's fugitive task force. Additionally, I honorably served my country in the United States Air Force for

six years. I have a bachelor's degree in Homeland Security from American Military University. I have applied for or participated in numerous search warrants during my career.

5.      As a USDA-OIG Special Agent, my duties involve investigating alleged violations of laws enforced by USDA. This includes cases and investigations involving criminal activities, including illegal animal fighting. I have received specialized training in the investigation of animal fighting and related Title 18 offenses. My prior experience in this area includes the use of confidential informants, undercover officers, electronic surveillance, and residential search warrants. I have participated in many aspects of criminal investigations, including residential search warrants, conducting surveillance, and issuing subpoenas. I have debriefed or participated in the debriefings of numerous defendants, informants, and witnesses.

6.      Through training and investigations of persons arrested for animal fighting offenses, I am familiar with the actions, traits, habits, and terminology utilized by handlers or owners of dogs involved in animal fighting ventures. I have also participated in investigations of suspected animal fighters.

7.      I am familiar with the facts set forth herein based on my personal observations and information provided to me by other law enforcement officers participating in this investigation. I am also familiar with the facts set forth herein based on my review of documents, reports, and photographs pertaining to this and other investigations.

8.      As the purpose of this affidavit is only to establish probable cause to support the requested search and seizure warrants, I have not set forth each and every fact known concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part. In addition, the events described in this affidavit occurred on or about the dates provided herein.

## BACKGROUND ON ANIMAL FIGHTING VENTURES

9.      Dog fighting typically involves pit bull type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

10.      Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

11.      Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

12.      Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

13.      "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

14. It is common for successful dog fighters to sell Champions and Grand Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

15. In order to get a dog or puppy to the new owner, dog fighters will often employ the use of a fighting dog "transporter." Dog fighters will look for transporters that understand dog fighting and the need to transport these "fighting dogs" in such a manner that the dogs cannot interact. Transporters will often advertise their services in online forums used by dog fighters. In addition, dog fighters and breeders will share their "favorite" transporter with each other on these forums and by text messages.

16. It is common for fighting dog transporters to travel extensively from state to state picking up and delivering multiple fighting dogs to numerous locations. The customers of these transporters will sometimes represent to the transporter that a dog is being transported for a specific fight; or for a "keep," *i.e.*, to be prepared for a specific fight; or to be bred to a specific dog from a fighting "bloodline."

17. These transporters generally do not operate as a legitimate, registered, overt business, because they are aware of the intentions of their customers, and derive their income predominantly or exclusively from those engaged in illegal activities with the dogs. Such transporters frequently charge additional fees for transporting a dog with scars or injuries, because they know they will be bearing the risk of criminal liability for possessing or transporting the dogs if they are stopped by law enforcement during the transport.

18. Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a

particular dog fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

19.    Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight." Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states in order to increase their odds of finding a match.

20.    Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then typically undergoes a conditioning process which dog handlers refer to as a "keep." This keep may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as steroids), vitamins, and other medicine. Animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

21.    Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

22.    Dog fighters often attempt to mend the injuries of their own dogs rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

23.    Although dogs used for fighting are often housed outside, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog

5

from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

24.    It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials can be found to exist in both hard and electronic copy. Dog fighters often maintain information regarding dog fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dog fighters post pedigrees to demonstrate the fighting lineage of their dogs.

25.    Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely hook matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

## PROPERTIES TO BE SEARCHED

A. 4350 Spencer Rd, Rembert, South Carolina 29128, Sumter County Parcel ID number 090-000-20-58 – the residence of Andrew Jeffery Bryant, hereinafter referred to as **BRYANT PROPERTY 1.**

B. Sumter County Parcel ID number 090-000-20-56 – a property used by Andrew Jeffery Bryant, hereinafter referred to as **BRYANT PROPERTY 2.**

C. 2299 Browntown Rd, Bishopville, South Carolina 29010, Lee County Parcel ID 035-00-00-170-000 – the residence of John Herman McDaniel, hereinafter referred to as **MCDANIEL PROPERTY 1.**

D. Lee County Parcel ID number 035-00-00-171-000 – a property used by John Herman McDaniel, hereinafter referred to as **MCDANIEL PROPERTY 2.**

E. 1201 Devonshire Dr, Sumter, South Carolina 29154, Sumter County Parcel ID number 226-160-10-53 – the residence of Mark Anthony McCray, hereinafter referred to as **MCCRAY PROPERTY.**

F. 14275 US-301, New Zion, South Carolina 29111, Clarendon County Parcel ID number 272-00-06-009-00 – the residence of John Edward Butler, hereinafter referred to as **BUTLER PROPERTY 1.**

G. Clarendon County Parcel ID number 272-00-06-007-00 – a property used by John Edward Butler, hereinafter referred to as **BUTLER PROPERTY 2.**

H. 14198 US-301, New Zion, South Carolina 29111, Clarendon County Parcel ID number 272-00-08-015-00 – a property used by John Edward Butler, hereinafter referred to as **BUTLER PROPERTY 3.**

I. 5370 Mayrant Rd, Rembert, South Carolina 29128, Sumter County Parcel ID number 088-000-20-78 – the residence of David Wright III, hereinafter referred to as **WRIGHT PROPERTY 1.**

J. Sumter County Parcel ID number 088-000-20-77 – a secondary property used by David Wright III, hereinafter referred to as **WRIGHT PROPERTY 2.**

K. 222 Berrywood Rd, Orangeburg, South Carolina 29115, Orangeburg Parcel ID number 0217-00-03-018.000 – the residence of Dominique Berry, hereinafter referred to as **BERRY PROPERTY 1.**

L. Orangeburg County Parcel ID number 0217-00-03-026.000 – a second property used by Dominique Berry, hereinafter referred to as **BERRY PROPERTY 2.**

M. 2023 Wildcat Creek Rd, Rock Hill, South Carolina 29730, York County Parcel ID number 599-000-000-1 – residence of Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 1.**

N. 2027 Wildcat Creek Rd, Rock Hill, South Carolina 29730, York County Parcel ID number 599-000-004-1 – a second property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 2.**

O. York County Parcel ID number 599-000-00-16 – a third property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 3**.

P. York County Parcel ID number 599-00-00-26 – a fourth property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 4.**

Q. York County Parcel ID number 599-000-00-02 – a fifth property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 5.**

R. York County Parcel ID number 599-000-00-35 – a sixth property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 6.**

S. York County Parcel ID number 599-000-00-05 – a seventh property used Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 7.**

T. York County Parcel ID number 599-000-00-24 – an eighth property used by Emmanuel Deon Foster, hereinafter referred to as **FOSTER PROPERTY 8.**

U. 1462 Waterspring Rd, Orangeburg, South Carolina 29118, Orangeburg County Parcel ID number 0176-00-01-007.000 – residence of Austin Nevin, hereinafter referred to as **NEVIN PROPERTY 1.**

V. Orangeburg County Parcel ID number 0176-00-01-006.000 – a second property used by Austin Nevin, hereinafter referred to as **NEVIN PROPERTY 2.**

W. 3236 Screaming Eagle Rd EXT, Eastover, South Carolina 29044, Richland County Parcel ID number R37901-01-05 – residence of Kevin Deontavis Williams, hereinafter referred to as **WILLIAMS PROPERTY.**

## FACTS SUPPORTING PROBABLE CAUSE



███████████████████████████████████████████

**BRYANT PROPERTY 1 and BRYANT PROPERTY 2**

30. ████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

31.     On September 9, 2022, I conducted surveillance at **BRYANT PROPERTY 1** and

**BRYANT PROPERTY 2** ████████████████████████████████

████████████ I observed **BRYANT'S** residence located on **BRYANT PROPERTY 1**. I observed

40 to 50 dogs kept apart from each other on **BRYANT PROPERTY 2**; the dogs were shackled to

heavy chains appearing to weigh approximately 40 to 60 pounds, affixed to the ground, and with

limited mobility. Additionally, some dogs were not provided adequate shelter from the elements.

I know from my training and experience that these factors are indicative of organized dogfighting.



**MCDANIEL PROPERTY 1 and MCDANIEL PROPERTY 2**

33.     On September 8, 2022, I conducted surveillance at **MCDANIEL PROPERTY 1**

and **MCDANIEL PROPERTY 2**.  On both properties, I observed several dogs, all of which were

kept in isolation from each other. The dogs were wearing thick collars, attached to heavy chains

appearing to weigh approximately 30 to 50 pounds and affixed to what appeared to be vehicle

axels staked into the ground.  The dogs displayed severe scarring around the face, neck, brisket,

and lower extremities. The dogs appeared to be emaciated. I know from my training and experience

that these factors are indicative of organized dogfighting.

11



**MCCRAY PROPERTY**



35.     On September 15, 2022, I conducted surveillance on **MCCRAY PROPERTY** █

█. I observed dogs kept

in isolation from one another; they were wearing heavy chains that were staked into the ground.   I

know from my training and experience that these factors are indicative of organized dogfighting.



**BUTLER PROPERTY 1, BUTLER PROPERTY 2,** and **BUTLER PROPERTY 3**



37.     On September 6, 2022, I conducted surveillance on **BUTLER PROPERTY 1**, **BUTLER PROPERTY 2**, and **BUTLER PROPERTY 3**. On all three properties, I observed dogs kept in isolation from each other. The dogs were wearing thick collars attached to heavy chains which appeared to weigh approximately 40 to 60 pounds and were either staked into the ground or wrapped around trees. The dogs displayed severe scarring around the face, neck, brisket, and lower extremities and appeared to be emaciated. Additionally, I observed a dogfighting pit on **BUTLER PROPERTY 3**. Inside the pit was a break stick with visible teeth marks. I know from my training and experience that these factors are indicative of organized dogfighting.







**WRIGHT PROPERTY 1 and WRIGHT PROPERTY 2**



39.     On September 7, 2022, I conducted surveillance on **WRIGHT PROPERTY 1** and **WRIGHT PROPERTY 2**. I observed dogs kept in isolation from each other on both properties. The dogs were wearing thick collars attached to heavy chains which appeared to weigh approximately 40 to 60 pounds and were staked into the ground. The dogs displayed severe scarring around the face, neck, brisket, and lower extremities, and appeared to be emaciated. I know from my training and experience that these factors are indicative of organized dogfighting.

40.     On September 19, 2022, I conducted surveillance on **WRIGHT PROPERTY 1** and **WRIGHT PROPERTY 2**. I again observed dogs kept in the same condition as described above and on both properties. I also observed what appeared to numerous dog skulls and skeletal remains on **WRIGHT PROPERTY 1** and **WRIGHT PROPERTY 2**. I know from my training and experience that dog fighters will often dispatch (i.e., kill) losing, ill, or sick dogs and dispose of the dog's remains on their properties.



**BERRY PROPERTY 1 and BERRY PROPERTY 2**



42.    On August 27, 2022, I conducted surveillance at **BERRY PROPERTY 1** and **BERRY PROPERTY 2**. I observed **BERRY's** residence located on **BERRY PROPERTY 1**. Adjacent to **BERRY PROPERTY 1**, I observed multiple dogs kept apart from each other on **BERRY PROPERTY 2**, wearing thick collars, attached to heavy chains appearing to weigh approximately 40 to 60 pounds, staked into the ground. The dogs displayed severe scarring to the face, neck, brisket, and lower extremities. I know from my training and experience that these factors are indicative of organized dogfighting.





**FOSTER PROPERTIES 1-8**



44.     On August 24, 2022, I conducted surveillance at **FOSTER PROPERTY 1,**
**FOSTER PROPERTY 2, FOSTER PROPERTY 3, FOSTER PROPERTY 4, FOSTER**
**PROPERTY 5, FOSTER PROPERTY 6, FOSTER PROPERTY 7,** and **FOSTER**
**PROPERTY 8.** On **FOSTER PROPERTIES 1-8,** I observed dogs kept in isolation from one
another, wearing thick collars attached to heavy chains which appeared to weigh approximately
40 to 60 pounds and were either staked into the ground or wrapped around trees. The dogs
displayed severe scarring around the face, neck, brisket, and lower extremities. I know from my
training and experience that these factors are indicative of organized dogfighting.









45.     Animal remains were also observed on **FOSTER PROPERTY 6**.



**NEVIN PROPERTY 1 and NEVIN PROPERTY 2**



47.     On July 27, 2022, I conducted surveillance at **NEVIN PROPERTY 1** and **NEVIN PROPERTY 2**. On both properties, I observed dogs kept in isolation from one another, wearing thick collars attached to heavy chains which appeared to weigh approximately 40 to 60 pounds and were either staked into the ground or wrapped around trees. The dogs displayed severe scarring around the face, neck, brisket, and lower extremities. I also observed a mobile outdoor dogfighting pit on **NEVIN PROPERTY 1**. I know from my training and experience that these factors are indicative of organized dogfighting.







WILLIAMS PROPERTY



49.    On August 26, 2022, I conducted surveillance at **WILLIAMS PROPERTY**. I observed dogs kept in isolation from one another, wearing thick collars attached to heavy chains which appear to weigh approximately 40 to 60 pounds and are staked into the ground or wrapped around trees. The dogs displayed severe scarring around the face, neck, brisket, and lower extremities. I know from my training and experience that these factors are indicative of organized dogfighting.



### SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA

50.    I know that dog fighters routinely maintain photos, videos, and other electronic media depiction of their dogs. They routinely send and receive electronic and text messages with other dog fighters.

51.     As noted above, there is probable cause to believe that evidence of violations of 7 U.S.C. § 2156 will be found on electronic storage media at the addresses/locations listed in Attachment A.

52.     *Electronic Storage Media*. As used in this affidavit, the term "electronic storage media" includes all equipment that can store, collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, and cellular phones and "smartphones"); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communication devices (such as routers, modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

53.     As described above and in Attachment B, this application seeks permission to search for dog fighting-related records and information that might be found on the Subject Premises, in whatever form they are found. The terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). Thus, the warrant applied

for would authorize the seizure of electronic storage media and the copying of electronically stored information, all under Rule 41(e)(2)(B).

54.    I submit that if electronic storage media is found on the Subject Premises, there is probable cause to believe those records will be stored on that electronic storage media, for at least the following reasons:

55.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

56.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

57.    Wholly apart from user-generated files, electronic storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.

58.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".

59.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the Subject Premises because:

60.     Data on the electronic storage media can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage media that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files created and the sequence in which they were created.

61.     Forensic evidence on electronic storage media can also indicate who has used or controlled the media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or

controlled the electronic storage media at a relevant time.

62.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

63.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on electronic storage media that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

64.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a particular electronic storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

65.    *Necessity of seizing or copying electronic storage media*. In most cases, a thorough search of a premises for information that might be stored on electronic storage media requires the seizure of the physical media and later off-site review consistent with the warrant. In lieu of removing electronic storage media from the premises, it is sometimes possible to make an image copy of the media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or

imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

66.     Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

67.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

68.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-

networked, desktop computer found during a search can easily contain the equivalent of 250 million pages of data, which, if printed out, would result in a stack of paper over ten miles high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or 450,000 songs.

69.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

70.    _Nature of examination_. Based on the foregoing, and consistent with Rule41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is

evidence described by the warrant.

71.     _Necessity of retaining forensic images for purposes of authentication at trial_. In anticipation of litigation relating to the authenticity of data seized pursuant to the Warrant, the Government requests that it be allowed to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

72.     In light of these concerns, I hereby request the Court's permission to search, copy, image, download, and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrants, and to conduct an off-site search of the image or hardware for the evidence described.

## CONCLUSION

43.     Based upon the information above, I have probable cause to believe that there exists evidence, fruits, and instrumentalities of the violations of 7 U.S.C. § 2156 in the residences, curtilages, exterior properties, sheds, outbuildings, and vehicles used to transport dogs for the purpose of buying, selling, or dogfighting, on the premises described above and further described in Attachment A.

44.     By this affidavit and application, I request that the Court issue a search warrant permitting federal agents and other authorized law enforcement agents and officers to search the residences, curtilages, exterior properties, sheds, outbuildings, and vehicles used to transport dogs for the purpose of buying, selling, or dogfighting, on the premises described in Attachment A and seize evidence as specified in Attachment B. Permission is sought to allow USDA-OIG to obtain the assistance of Federal, State, or local law enforcement authorities, and an animal rescue group or contractor identified by the U. S. Marshal's Service to handle and provide necessary care to any animals seized, in executing the searches of the Subject Premises described in Attachment A.

Permission is also sought to allow these parties to seize items identified in Attachment B as well as to take photographs or video of any location, item, or individual at the search site, use water and electrical power at search site, to set up necessary equipment, and to establish safety perimeters as government agents deem necessary to accomplish the searches. The government also seeks permission to allow animal technicians to enter the property to assist with handling of animals once the premises are secure and the searches have been completed and then take physical custody of the seized animals.

45.     "Necessary care including veterinary treatment shall be provided" to any dogs seized, as required by the Animal Welfare Act. 7 U.S.C. § 2156(f).

46.     _Request to Execute Warrants Anytime Day or Night_:

Accordingly, the government requests that the Court authorize search and seizure to occur at any time, day or night.

This Affidavit has been reviewed by AUSA Jane B. Taylor.

Dustin McPhillips, Special Agent
United States Department of
Agriculture, Office of Inspector General

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This 21st day of September , 2022
Columbia, South Carolina

Paige J. Gossett
United States Magistrate Judge